UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON MANNING, | Case No.: 1:16-cv-00390-JLT |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION |
| v. | |
| PARSONS TRANSPORTATION GROUP, INC., AND DOES 1 through 50, | (Doc. 8) |
| Defendants. | |

Parsons Transportation Group, Inc. seeks to compel arbitration and stay this action initiated by Plaintiff Sharon Manning. (Doc. 8) Parsons argues that the plaintiff agreed to arbitrate all claims that arose from her employment including claims for unlawful harassment, discrimination or retaliation. For the following reasons, Defendants' motion to compel arbitration is **GRANTED**.

**I.   Background**

Plaintiff, who is 70 years old, alleges she began working for Parsons Transportation Group, Inc., in 2006 as a senior administrative assistant on a project that also involved the City of Bakersfield, County of Kern, and CALTRANS. (Doc. 1 at 1, ¶¶ 3-4) She asserts her "responsibilities included: (1) administrative assistance for the office including typing, preparing monthly reports, filing, mail, planning of office parties, and taking care of anything the office needed, and (2) special projects." (*Id.* at 2, ¶ 3) Plaintiff reports her supervisors were Chris Clark, the program manager, and Girair Kotchian, the deputy program manager. (*Id.*) She asserts that under these supervisors, her work "was good and

she was well like and performed her job well." (*Id.*, ¶ 5)

According to Plaintiff, after Chris Clark retired, he was replaced by Bill Knoetgen (Doc. 1 at 2, ¶ 6) Mr. Knoetgen "selected Aric Barto to replace Girair Kotchian," who transferred to a different office. (*Id.*) Plaintiff asserts "Knoetgen never used Plaintiff for any administrative purposes," but "made derogatory comments about Plaintiff's age after he started working." (*Id.*, ¶ 7) She alleges that "Knoetgen made derogatory ageist comments about other employees who were over 40 and protected by the ADEA and FEHA." (*Id.*) She reports that Parsons employees, "along with employees of the City and County complained about Knoetgen and his treatment of the personnel," which resulted in an investigation during 2013. (*Id.*, ¶ 8)

Plaintiff alleges that in 2013, "her offices [were] moved upstairs away from the other staff," upon the instruction of Knoetgen. (Doc. 1 at 2, ¶ 9) She asserts, "When Plaintiff asked Barto if Knoetgen was tired of looking at an old secretary, Barto advised Plaintiff 'out of sight out of mind.'" (*Id.*) Plaintiff reports she told Barto "there was insufficient space for the files that needed to accompany Plaintiff in the new upstairs offices assigned to her," but he simply "told Plaintiff she had to make the files fit in the small space." (*Id.*) Further, Plaintiff asserts another employee was placed in the same office, which made "the quarters very crowded and difficult to maneuver." (*Id.*)

She alleges that the day of the scheduled move, "two much younger female employees" named Jasmine and Danielle began working on the first floor "to perform administrative duties." (Doc. 1 at 3, ¶ 11) According to Plaintiff, "Even though Plaintiff's title was senior administrative assistant, neither of these two employees were interviewed by Plaintiff and Plaintiff was not involved in their hiring. Neither of these two employees were placed under Plaintiff's supervision." (*Id.*) Plaintiff reports that the same day she was scheduled to move offices, she "suffered a major health issue," and she "took approximately four months off work due to her physical condition." (*Id.*, ¶ 10)

She reports that after her return from medical leave, she began working upstairs but "was told by Aric that she could no longer perform all her former duties because the company had Jasmine and Danielle." (Doc. 1 at 3, ¶ 12) Plaintiff alleges Aric instructed her "to teach Danielle how to perform Plaintiff's prior administrative duties." (*Id.*) She was also assigned to help Lizette, who worked in document control, and "given a special project of going through boxes and ensuring the company had

2

electronic and hard copies of all documents." (*Id.*, ¶ 13)  Plaintiff reports she continued to "perform[] some of some of her former administrative duties (answering phones and ordering supplies)." (*Id.*)

According to Plaintiff, when Lizette left Parsons, she was not given the opportunity to take over Lizette's document control duties.  (Doc. 1 at 3, ¶ 14)  Rather, "Knoetgen placed Jasmine in Lizette's former position, and Plaintiff was forced to help train Jasmine." (*Id.*)

Plaintiff alleges that when Parsons relocated its offices, she "was not given any office space in [the new] building," though Jasmine received an office there.  (Doc. 1 at 3, ¶ 15)  Instead, Plaintiff reports she moved to an office "in a separate building 1.5 blocks away in a basement in a city building where archives were located." (*Id.,* ¶ 16)  She asserts that after moving to the new office, she "had substantial documents left in the special project to review, and was still performing administrative duties." (*Id.*)  She alleges, "[w]ithin approximately 30 days after the move, Plaintiff was informed she was being laid off by defendant." (*Id.*)  Her "final day of work was January 21, 2014." (*Id.* at 4, ¶ 17)

Plaintiff reports she filed a claim with California's Department of Fair Employment and Housing and received a right to sue notice.  (Doc. 1 at 4, ¶ 19)  Based upon the foregoing facts, she initiated the matter now pending before the Court by filing a complaint on March 18, 2016.  Plaintiff contends Parsons is liable for the following causes of action: (1) a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623; (2) age discrimination and wrongful termination in violation of California's Fair Employment and Housing Act ("FEHA"); (3) a hostile work environment in violation of FEHA; and (4) failure to prevent discrimination and retaliation.  (*See id.* at 5-8)

On April 26, 2016, Parsons filed the motion to compel arbitration now pending before the Court, asserting Plaintiff previously agreed to arbitrate claims encompassed in this lawsuit.  (Doc. 8)  Parsons observes that when Plaintiff signed her offer of employment from Parsons, she agreed to be bound by Parsons' Employee Dispute Resolution Program.  (*Id.* at 2)  Parsons contends that once Plaintiff began work at Parsons on August 28, 2016:

> Plaintiff acknowledged her understanding that the EDR Program's mandatory arbitration procedures applied to any employment dispute that arose between her and Parsons, that she waived her right to go to court regarding legally protected rights, that her employment was at-will, that she had the right to have an attorney of her choice review the EDR Program materials, and that she was signing the agreement voluntarily.

(*Id.* at 3)  Accordingly, Parsons contends the filing of the action now before the Court is a violation of

her agreement to submit disputes to the EDR program, and seeks to compel arbitration.  Plaintiff filed her opposition to the motion on May 10, 2016 (Doc. 13), to which Defendant filed a reply on May 17, 2016.  (Doc. 15)

## II.      Parsons' Program

Parsons implemented the Employee Dispute Resolution Program ("the EDR Program") on April 1, 1998.  (Doc. 8-2 at 10, 12)  Accordingly, "the EDR Program [became] the exclusive means of resolving workplace disputes for both [employees] and Parsons…including disputes involving Legally Protected Rights, such as freedom from discrimination, retaliation, or harassment." (*Id.* at 12) Employees were informed:  "If you accept or continue employment with Parsons on or after April 1, 1998, you agree to resolve all employment-related legal claims against the Company, including termination claims, through this process instead of through the court system." (*Id.*)

Under the EDR Program, the parties may go through three steps: (1) taking disputes through the "management train," including a supervisor, human resources representative, department/office manager, human resources director, business unit president, and a corporate executive; (2) mediation, through which "an outside, neutral third party" assists the parties with coming to a resolution; and (3) arbitration, through which the dispute was taken "to an outside, neutral third party for resolution by binding decision." (Doc. 8-2 at 13)  Pursuant to the EDR Program, "The mediation and arbitration steps apply only to disputes involving Legally Protected Rights or Legally Protected Claims."  (*Id.* at 15, emphasis omitted)

If an employee proceeds to mediation or arbitration, the fees for each are paid for by Parsons. (Doc. 8-2 at 17, 20)  In addition, the company assists with the costs of legal representation, if an individual elects to proceed with the assistance of an attorney.  (*Id.*)

## III.     Legal Standard

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2. The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A

party seeking to enforce arbitration agreement may petition the Court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

"[T]he FAA applies to employment contracts if the employment affects interstate commerce." *CarMax Auto Superstores Cal. LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1100 (C.D. Cal. 2015). "[T]here is a strong default presumption that the Federal Arbitration Act, not state law, supplies the rules for arbitration." *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004) (internal quotation marks omitted). Here, Defendants demonstrated that its business affects interstate commerce because "Parsons has operations and does business throughout the United States." (Ferguson Decl. ¶ 6, Doc. 8-2 at 2)  The presumption of FAA applicability, coupled with evidence that Defendants operate nationwide, indicates that the FAA governs to the arbitration policy.

The Court's role in applying the FAA is "limited to determining whether a valid agreement to arbitrate exists and, if so, whether the agreement encompasses the dispute as issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960). Because the FAA "is phrased in mandatory terms," "the standard for demonstrating arbitrability is not a high one [and] a district court has little discretion to deny an arbitration motion." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  As a result, arbitration should only be denied when "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986).  It is well-established that "arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Lifescan*, 363 F.3d at 1011.

///

## IV. Discussion and Analysis

### A. Validity of the arbitration agreement

When determining whether a valid and enforceable agreement to arbitrate has been established for the purposes of the FAA, the Court should apply "ordinary state-law principles that govern the formation of contracts to decide whether the parties agreed to arbitrate a certain matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Circuit City Stores v. Adams*, 279 F.3d 889, 892 (2002). Here, the parties agree the law of the state of California governs the determination of whether the agreement is valid. (*See generally* Doc. 8; Doc. 14)

Pursuant to California contract law, the elements for a viable contract are "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration." *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550; *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)). The Supreme Court explained, an agreement to arbitrate may be "invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011).

Under California law, an arbitration agreement may only be invalidated for the same reasons as other contracts. Cal. Code Civ. Proc. § 1281. For example, a contract "is unenforceable if it is both procedurally and substantively unconscionable." *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007)). Procedural unconscionability focuses on "oppression and surprise," while substantive unconscionability focuses upon "overly harsh or one-sided results." *Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1532 (1997) (citations omitted). Both forms of unconscionability must be present in order for a court to find a contract unenforceable, but it is not necessary that they be present in the same degree. *Davis*, 485 F.3d at 1072; *Stirlen*, 51 Cal. App. 4th at 1532. Consequently, "[c]ourts apply a sliding scale: 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Id.* (quoting *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 99 (2000)).

Defendant contends the arbitration agreement is valid under general principles of contract law.

(Doc. 8 at 7-9)  Defendant reports that Plaintiff acknowledged on two occasions that any dispute with Parsons related to her employment must be submitted to the EDR Program.  (*Id.* at 2-3)  Defendant contends the EDR Program complies with California law, by providing a neutral arbitrator, adequate discovery, directing the arbitrator to issue a written decision, not limiting the remedies available, and directing the company to pay the costs of arbitration.  (*Id.* at 7-9) Therefore, Defendant contends the agreement "is not procedurally or substantively unconscionable." (*Id.* at 7, emphasis omitted) On the other hand, Plaintiff asserts, "the alleged agreement in question is both procedurally and substantively unconscionable as the EDR Program was forced on Plaintiff, it lacks mutuality, and provides for inadequate discovery." (Doc. 14 at 2)

          1.      Procedural Unconscionability

The threshold issue in for procedural unconscionability "is whether the subject arbitration clause is part of a contract of adhesion."  *Stirlen*, 51 Cal. App. 4th at 1532; *see also Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1042 (9th Cir. 2001).  A contract of adhesion "is a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."  *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817 (1981).  Accordingly, the Court must examine "the manner in which the contract was negotiated and the circumstances of the parties at that time."  *Kinney v. United Healthcare Services*, 70 Cal. App. 4th 1322, 1327 (1999).  Specifically, the Court determines whether the contract was "imposed on employees as a condition of employment."  *Soltani*, 258 F.3d at 1042.

In general, under California law, it is "procedurally unconscionable to require employees, as a condition of employment, to waive their right to seek redress of grievance in a judicial forum."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003); *see, e.g., Armendariz*, 24 Cal.4th at 113 (explaining an arbitration agreement was procedurally unconscionable because it was imposed on employees as a condition of employment, and there was no opportunity for them to negotiate); *Aral v. Earthlink, Inc.*, 134 Cal.App.4th 544, 557 (2005) (an arbitration clause on a "take it or leave it" basis demonstrates "quintessential procedural unconscionability"); *Martinez v. Master Protection Corp.*, 118 Cal. App. 4th 107 (2004) (finding an arbitration agreement procedurally unconscionable because it was a prerequisite of employment and the employee did not have an "opportunity to negotiate or

refuse to sign the arbitration agreement"); *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (Ct. App. 2001) ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability").

*a.     Surprise and knowing wavier*

The Ninth Circuit determined that "Congress intended there to be at least a knowing agreement to arbitrate employment disputes before an employee may be deemed to have waived the comprehensive statutory rights, remedies and procedural protections prescribed in Title VII and related state statutes." *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1304 (9th Cir. 1994). As a result, the court later held "[a]ny bargain to waive the right to a judicial forum for civil rights claims … in exchange for employment or continued employment must at the least be express: the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question." *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997).

In *Lai*, the appellants argued they did not making a knowing waiver of their right to arbitrate employment discrimination claims. *Id.*, 42 F.3d at 1302-1303. The Court noted that each of the appellants executed a form that stated:

> I agree to arbitrate any dispute, claim or controversy that may arise between me or my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or bylaws of the organizations with which I register.

*Id.* at 1302. As the Court observed, "This provision does not in and of itself bind appellants to arbitrate any particular dispute." *Id.* Instead, "[t]see what appellants possibly could have agreed to arbitrate" they had to look at the arbitration requirements the organization with which the appellants registered: the NASD. *Id.* The Court reviewed the NASD manual and observed the terms stated it covered "[a]ny dispute, claim or controversy ...  between or among members and/or associated persons . . . arising in connection with the business of such member(s) or in connection with the activities of such associated person(s)." *Id.* The court concluded that because the form signed by the appellants "did not purport to describe the types of disputes that were subject to arbitration" and the NASD manual did not put appellants on notice they were bound to arbitrate their employment disputes, they had not made a knowing waiver of their right to statutory remedies. *Id.* at 1305.

Likewise, in *Nelson*, the plaintiff argued he had not "'knowingly and voluntarily' agreed to

waive his right to a judicial forum." *Id.*, 119 F.3d at 761.  Nelson received a copy of a revised employee Handbook from his employer and signed an acknowledgement form.  *Id.* The Court reviewed the acknowledgment form and the Handbook and found nothing in either document "put Nelson on notice that . . . he was somehow entering into an agreement to waive a specific statutory remedy afforded him by a civil right statute." *Id.* at 762.  Because the plaintiff choice was not "explicitly" informed that by continuing his employment he was waiving his rights, the Court found he "did knowingly waive his statutory rights to a judicial forum." *Id.* at 762-63.

In contrast, here, the EDR specifically informed employees that all claims resulting from the employment would be arbitrated.  The EDR reads,

> **The mediation and arbitration steps apply only to disputes involving Legally Protected Rights or Legally Protected Claims**, including any legal claim or controversy that a judge, jury, administrative agency, or other governmental body would decide. This includes, but is not limited to: claims for wrongful discharge, constructive discharge, . . . claims for discrimination (including, but not limited to  . . . age . . . and claims for violation of any federal or state law. . . Laws under which such claims may be brought include Title VII of the Civil Rights Act of 1964 and other Civil Rights Acts, the Age Discrimination in Employment Act . . . or law regarding employment discrimination, conditions of employment, or the termination of employment.

(Doc. 8-2 at 15-16)

Moreover, it appears Plaintiff knowingly consented to arbitrate her claims.  When Plaintiff received an offer letter from Parsons, it included a document entitled "Attachment 'A'," which stated, among other terms regarding benefits and pre-employment drug testing, that Manning was agreeing to be bound by Parsons' Employee Dispute Resolution Program." (Doc. 8 at 2; *see also* Ferguson Decl. Exh. A, Doc. 8-2 at 4-5) Specifically, Attachment A indicated in relevant part:

> We believe you will find Parsons to be a professional and friendly work environment, however, in the event that conflicts arise, Parsons has a three-step Employee Dispute Resolution (EDR) Program. The EDR Program includes Freedom of Expression & Appeal, Mediation, and Arbitration as the exclusive means of resolving workplace disputes. **By accepting employment, you agree to resolve all legal claims against Parsons through this process instead of the court system**.

(Doc. 8-2 at 6) (emphasis added)  Plaintiff signed and dated her acceptance of the employment offer on August 7, 2006.  (*Id.*)

Further, Defendant reports that "once Plaintiff had commenced employment with Parsons, she

9

signed a document entitled, "Employee Agreement – Parsons Employee Dispute Resolution Program." (Doc. 8 at 3; *see also* Doc. 8-2 at 2, Ferguson Decl. ¶ 4)  The Employee Agreement stated:

> 1. I, Sharon Manning recognize that differences may arise between me and Parsons, (including Parsons Corporation, and its direct or indirect US subsidiaries) during or following my employment with Parsons. I have received the Parsons Employee Dispute Resolution Program (EDR Program) booklet, and **I agree to be bound by the terms of the EDR Program during and after my employment with Parsons, for all claims arising out of my employment relationship with Parsons**, except those disputes described in the Employee Agreement and Acknowledgment of Obligation form, a copy of which I have also received, otherwise generally relating to confidentiality and intellectual property.
>
> 2. I understand the EDR Program includes mandatory arbitration provisions. I acknowledge that these mandatory provisions will apply to any employment disputes that arise between me and Parsons, and I agree to be bound by them.  **I understand my acceptance of the EDR Program and its mandatory arbitration provisions are conditions to my employment and continued employment at Parsons**.
>
> 3. As consideration, in addition to my obtaining and continuing employment with Parsons, I understand that I am gaining, among other benefits, access to a speedy, impartial dispute resolution program and procedure, as described in the EDR Program booklet. **I hereby waive my right to go to court regarding legally protected rights, and understand, agree and acknowledge I will not be able to have a trial by jury for claims relating to these rights**.  Instead, **by accepting and continuing employment, I agree to utilize the dispute resolution provisions offered by the EDR Program**, as amended from time to time, and related procedures and policies.
>
> 4. I understand and agree that my employment at Parsons is at will. My employment can be terminated at will, with or without cause, any time at my option or the Company's. The EDR Program does not alter the at will status of my employment.
>
> 5. I understand that I have the right to have an attorney of my choice review this agreement and the EDR Program materials, and this agreement is voluntarily accepted by me.

(Doc. 8-2 at 8) (emphasis added).  Plaintiff signed and dated the document on August 28, 2006.  (*Id.*) In contrast with the facts before the Court in *Nelson*, Plaintiff was "explicitly" notified that if she accepted a position with Parsons, any dispute related to her work with Parsons was expected to go through the EDR Program.  Further, Plaintiff indicated she received the booklet governing arbitration prior to signing the Employee Agreement.  (*See id.*)  Thus, there was no surprise to Plaintiff regarding the arbitration terms, and she knowingly consented to arbitrate any claims related to her employment with Parsons.

### b.   *Oppression*

Though there was no surprise to Plaintiff, the agreement appears to be oppressive because

Plaintiff was not given an opportunity to negotiate the terms. Suzanne Ferguson, Employee Relations Manager for Parsons Corporate, reports: "Prior to the commencement of employment with Parsons, each employee receives an offer letter which includes notice of Parsons' Employment Dispute Arbitration Program. The offer letter expressly states the arbitration program will apply to the employee's employment with Parsons." (Doc. 8-2 at 1-2, Ferguson Decl. ¶ 3) In addition, Ms. Ferguson states, "At the commencement of employment, all employees are *required* to complete new hire paperwork which includes, among other documents, an Employee Agreement - Employee Dispute Resolution Program." (*Id.* at 2, ¶ 4 (emphasis added)) Thus, Parsons offered Plaintiff the choice to accept the arbitration agreement or to seek employment elsewhere, and the company was in a stronger bargaining position than Plaintiff. *See Armendariz*, 24 Cal. 4th at 115 (explaining with arbitration agreements, "the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration agreement").

Because the agreement to submit to the dispute resolution program was offered on a "take it or leave it" basis, the agreement was procedurally unconscionable. *Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893 (9th Cir. 2002). However, the lack of surprise regarding the terms supports a conclusion that the level of procedural unconscionability is lessened. *See Stirlen*, 51 Cal.App.4th at 1532 (directing the court to consider both "oppression and surprise").

### 2. Substantive Unconscionability

"Substantive unconscionability addresses the fairness of the term in dispute." *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Ct. App. 2002). While "parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope," substantive unconscionability "limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting the forum for itself." *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003) (quoting *Armendariz*, 24 Cal. 4th at 118). Thus, the focus of the Court's inquiry is whether an agreement is one-sided and will have an overly harsh effect on the party not given an opportunity to negotiate its terms. *Flores*, 93 Cal. App. 4th at 854.

The Ninth Circuit instructs courts applying California law to arbitration agreements "look

beyond facial neutrality and examine the actual effects of the challenged provision." *Ting*, 319 F.3d at 1149; *see, e.g., Ingle*, 328 F.3d at 1180 (finding an arbitration agreement substantively unconscionable upon review of the agreement's provisions, including claims subject to arbitration, its statute of limitations, class actions, fee and cost-splitting arrangements, remedies available, and termination/modification of the agreement). Here, Plaintiff contends the agreement is substantively unconscionable for "lack of mutuality," limitations on discovery, and the requirement for employees to incur costs. (*See generally* Doc. 14 at 3-14)

### a.   Claims subject to arbitration

An arbitration agreement that "compels arbitration of the claims employees are most likely to bring against [the employer] but exempts from arbitration the claims [the employer] is most likely to bring against its employees" is substantively unconscionable. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 785 (2002) (quoting *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 175-76 (2002). For example, in *Ferguson* and *Mercuro*,[1] the courts found Countrywide's arbitration agreement was substantively unconscionable, because it excluded claims "for intellectual property violations, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information." *Ferguson*, 298 F.3d at 785 *Mercuro*, 96 Cal. App. 4th at 176.

Here, the claims subject to arbitration include "workplace disputes for both [employees] and Parsons…, including disputes involving Legally Protected Rights, such as freedom from discrimination, retaliation, or harassment." (Doc. 8-2 at 12) The EDR Program indicates that issues not covered in the EDR Program include:

> Claims regarding employee benefits (where plans provide separate dispute resolution provisions) payroll, unemployment insurance compensation and workers' compensation are not covered by the EDR Program.
>
> All disputes arising from claims related to unfair competition, the use or unauthorized disclosure of trade secrets or confidential information, and other intellectual property claims, will continue to be governed by the terms of Parsons Employee Agreement and Acknowledgment of Obligation.
>
> Applicable claims covered by the dispute resolution provisions of any employment agreement between Parsons and any employee; for example, contracts of U.S. citizens or

---

[1] Both cases involved the arbitration agreement of Countrywide Credit Industries. *See Ferguson*, 298 at 784 ("During oral argument, counsel for Countrywide conceded that the provisions of the arbitration agreement in the present case are the same as the provisions of the arbitration agreement at issue in *Mercuro*").

residents on international assignment for Parsons that contain alternative dispute resolution provisions, and applicable provisions of a collective bargaining agreement.

(*Id.* at 16)

Unlike in *Armendariz*, the EDR Program does not simply exempt Parsons from arbitrating disputes it has with the employee. On the other hand, as Plaintiff argues some of the claims identified—including unfair competition, unauthorized disclosure of trade secrets, and other intellectual property claim—are likely to only be brought by the employer. In *Armendariz,* the court observed that "an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences." *Id.*, 24 Cal. 4th at 121. The court found the lack of mutuality and substantive unconscionablility was exhibited "by the fact that there is no single no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement." *Id.* at 125. In contrast, here, there is a specific provision identifying "issues not covered" that the Court may sever from the agreement to address the lack of mutuality implied by the claims excluded from the EDR Program.[2]

Moreover, the "issues not covered" by the EDR Program are not relevant to the matter now pending before the Court. Accordingly, the provision may be severed from the agreement. *See, e.g., Grabowski v. C.H. Robinson Co.*, 817 F. Supp. 2d 1159 (S.D. Cal. 2011) (finding three substantively unconscionable provisions could be severed from an arbitration agreement which was not "permeated by unconscionability," thus rendering the agreement enforceable); *Stacy v. Brinker Rest. Corp.*, 2012 U.S. Dist. LEXIS 150345, at * 31-32 (E.D. Cal. Oct. 18. 2012) (explaining the substantively unconscionable provision could be severed because it was "collateral to the Agreement and does not permeate the Agreement with unconscionability").

///

---

[2] Plaintiff also argues the lack of mutuality is also demonstrated by the fact that the language of the EDR Program includes phrases such as "[a]rbitration [is] a process in which your dispute is presented to an arbitrator." However, it is undisputed that the packet booklet is prepared for employees and "is posted on Parsons' internal intranet page, where all Parsons' corporate policies are posted for employees." (Doc. 8-2 at 2, Ferguson Decl. ¶ 5) Consequently, in light of the fact that Parsons is also bound to the terms of the EDR Program, the Court does not find the language directed to employees evidences a lack of mutuality.

    b.  *Expenses*

When arbitration is a condition of employment, an employer "cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear . . . in court." *Armendariz*, 24 Cal. 4th at 110 (emphasis in original). A scheme that makes each party bear half the costs of the arbitration "alone would render an arbitration agreement unenforceable." *Circuit City v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002). For example, the Ninth Circuit found a cost-splitting provision substantively unconscionable when the agreement forced the plaintiffs to pay the filing fee up to a maximum of $125.00 and share costs equally after the first day of arbitration. *Ferguson*, 298 F.3d at 781*; see also Ingle*, 328 F.3d at 1177-78 (finding a provision substantively unconscionable that required "each party [to] pay one-half of the costs of arbitration following the issuance of the arbitration award").

In this case, Parsons pays the fees for the mediator or arbitrator, and provides assistance in paying for counsel if an employee elects to proceed through the EDR Program with an attorney. (*See* Doc. 8-2 at 20, 22, 25) Specifically, the "Legal Assistance Plan" provision indicates Parsons will pay 80% of the legal fees incurred by an employee, up to $2,500." (*Id.* at 22) Further, the arbitrator is authorized to award attorneys' fees to a prevailing employee or former employee of Parsons. (*Id.* at 20) Because the provisions governing fees and costs do not require employees to incur any *type* of expenses they would otherwise avoid in court, the fee/cost arrangements under the EDR Program are not substantively unconscionable.

    c.  *Remedies*

Remedy provisions that "fail[] to provide for all the types of relief that would otherwise be available in court" by limiting an employee's total and punitive damages are substantively unconscionable. *Adams*, 279 F.3d at 895 (citing *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482 (9th Cir. 1997)). The EDR Program provides the arbitrator has the authority to award "any remedy [one] might obtain through a court of law, including back pay, front pay, reinstatement, attorney's fees, and compensatory and punitive damages." (Doc. 8-2 at 20) Therefore, the EDR Program does not improperly limit the available remedies.

///

14

*d.     Limitations on discovery*

California law requires that an arbitration agreement "provide for adequate discovery." *Armendariz*, 24 Cal. 4th 83 at 122.  In *Armendariz,* the court observed that parties are "permitted to agree to something less than the full panoply of discovery provided in Code of Civil Procedure section 1283.05." *Id.* at 106.

The EDR Program provides: "To reduce the costs of both sides, discovery is limited, but still available.  For example, you and the Company each have the right to take one deposition, and more if the arbitrator so orders on a party's request. Parties also have the opportunity to obtain documents from the other side." (Doc. 8-2 at 26)  Plaintiff contends this provision places "substantial limits on discovery," and "falls far short" of allowing adequate discovery. (*Id.*)  Plaintiff notes that in *Martinez v. Master Protection Corp*. (2004) 118 Cal.App.4th 107, the court found the discovery limitation evidenced the otherwise one-sidedness of the agreement:

> We recognize that in many employment disputes restricting a plaintiff to a single deposition and document request could place him at a serious disadvantage if testimony from numerous witnesses is necessary to prepare his case. We also are aware the same restriction could operate to the employer's advantage, because it has ready access to most of the relevant documents and many of the witnesses remain in its employ. Consequently, the employer has far less need for discovery in order to prepare for arbitration than the employee which is not limited by the terms of the agreement."

(Doc. 14 at 12)  Further, Plaintiff observes that in *Fitz v. NCR Corp*., the court determined a limitation to two depositions was unconscionable where a provision "[g]ranting the arbitrator discretion to determine whether additional discovery is necessary, as the ACT policy does, is an inadequate safety valve."  (*Id.* at 13, quoting *Fitz,* 118 Cal. App. 4th 702, 717 (2004)).

In *Fitz,* the parties were limited to two depositions "unless the arbitrator finds a compelling need to allow it." *Id.*, 118 Cal. App. 4th at 716.  The arbitration agreement "require[d] the arbitrator to limit discovery as specified in the agreement unless the parties can demonstrate that a fair hearing would be *impossible* without additional discovery." *Id.* (emphasis added).  The court found that despite the provision allowing the arbitrator to grant additional discovery, the arbitrator was "constrained" by the "impossibility standard." *Id.* at 717.  The court explained, "we do not believe that an employee should be forced to demonstrate this impossibility to an arbitrator before being granted access to the type of discovery that is necessary for a fair opportunity to vindicate her claim." *Id.* at 719.  Accordingly, the

court determined that the provision regarding discovery was substantively unconscionable. *Id.* In contrast, here, the arbitrator is not held to an "impossibility" standard, and no party has a burden of proof in seeking additional discovery.

Similarly, Parson's EDR Program may be distinguished from the provisions before the court in *Martinez* where the arbitration agreement, "absent a demonstration of 'substantial need,' restrict[ed] discovery to a single deposition and a document request." *Id.*, 118 Cal. App. 4th at 118. Again, there is no requirement for parties in the EDR Program to show a "substantial need" prior to the arbitrator approving a request for additional discovery. Because the EDR Program allows the arbitrator to authorize additional discovery—without a showing of either a "substantial need" that a fair hearing would be "impossible" without such discovery—the discovery provision is not substantively unconscionable. *See, e.g.*, *Jacovides v. Future Foam, Inc.,* 2016 U.S. Dist. LEXIS 57530 at *31 (N.D. Cal. Apr. 25, 2016) (finding the initial limitation to one deposition in an arbitration agreement was not substantively unconscionable where "it allows the arbitrator to authorize further discovery without the limitation of a high standard such as "impossib[ility]" of a fair hearing without such discovery … or "substantial need") (internal citations omitted).

### e. Unilateral amendment and termination

When provisions of an arbitration agreement permit an employer to unilaterally amend or terminate the agreement, even with written notice to employees, the provision is substantively unconscionable. *See, e.g., Ingle*, 328 F.3d at 1179; *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp. 2d 1008, 1021-22 (E.D. Cal. 2008). The Ninth Circuit explained a provision granting an employer unilateral power to amend or terminate an arbitration agreement, even with written notice to employees, proscribes an employee's ability negotiate and "embeds its adhesiveness." *Ingle*, 328 F.3d at 1179.

The EDR Program provides that it "could be altered or eliminated based on changes in the law or other circumstances," and "[i]f any such changes are made, the Company will notify all affected employees in writing." (Doc. 8-2 at 27). As observes, the Ninth Circuit has determined that the unilateral right to amend or terminate an arbitration agreement, where it "affords no such power to employees," is substantively unconscionable. *See Ingle*, 328 F.3d at 1179.

///

       *f.*  *Agreement as a whole*

  California law provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). Refusing to enforce an arbitration agreement is appropriate "only when an agreement is permeated by unconscionability." *Armendariz*, 24 Cal.4th 83 at 122 (internal quotation marks omitted). Courts often look to whether the offending provisions "indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Id.* at 124; *see also Ferguson*, 298 F.3d at 787-88. For example, the Ninth Circuit found an arbitration agreement was "permeated by unconscionable clauses" where there was a "lack of mutuality regarding the type of claims that must be arbitrated, the fee provision, and the discovery provision." *Ferguson*, 298 F.3d at 788.

  In this agreement, the only provisions of the EDR Program appearing substantively unconscionable are those regarding the "issues not covered" and granting unilateral amendment and termination of the dispute resolution program. However, the EDR Program provisions regarding discovery, remedies, fees, and costs are not permeated by unconscionability and do not establish an inferior forum that works to Defendant's advantage. *See Armendariz*, 24 Cal. 4th 83 at 122. Significantly, the unconscionable provisions are not relevant to Plaintiff's claims, and may be severed from the agreement. *See Grabowski*, 817 F. Supp. 2d 1159; *Stacy*, 2012 U.S. Dist. LEXIS 150345 at *31-32. Accordingly, the terms, taken as a whole, do not appear substantively unconscionable.

  **B.**  **The Disputed Issues**

  To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960).

  Significantly, the Supreme Court explained, "Parties can agree to arbitrate 'gateway' questions

of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2779-80 (2010). Under the terms of the EDR Program, the parties agreed to arbitrate any dispute related to employment at Parsons, which includes disputes relating to "Legally Protected Rights, such as freedom from discrimination, retaliation, or harassment;" termination claims; and "workplace disputes" and "claims concerning the validity of this EDR Program itself or any aspects or procedures hereunder." (Doc. 8-2 at 12, 15). Based upon these broad specifications, the disputed issues are encompassed within the arbitration agreement.

### V. Conclusion

Plaintiff and Defendant entered into a valid arbitration agreement, which encompasses the issues in dispute. As a result, "there is a presumption of arbitrability" and Defendant's motion to compel arbitration should not be denied. *See AT&T Tech., Inc.*, 475 U.S. at 650.

Accordingly, **IT IS HEREBY ORDERED**:

1. The clauses governing "issues not covered," amendment, and termination are severed from the EDR Program plan;
2. Defendant's motion to compel arbitration is **GRANTED**;
3. The matter is **STAYED** to allow the completion of the arbitration;
4. Within 120 days and every 120 days thereafter, counsel **SHALL** file a joint status report. In addition, within 10 days of the determination by the arbitrator, counsel SHALL file a joint status report; and
5. The Court retains jurisdiction to confirm the arbitration award and enter judgment for the purpose of enforcement.

IT IS SO ORDERED.

Dated: **June 13, 2016**         **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE